UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                  :

AMY BORDEAUX,                           :

                    Plaintiff,      :

                               :        20-cv-1347 (LJL)

        -v-                   :

                               :        OPINION AND ORDER

HALSTEAD PROPERTY DEVELOPMENT    :

MARKETING LLC,                :

                               :

                  Defendant.     :

                               :
---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/16/2022

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Amy Bordeaux ("Bordeaux" or "Plaintiff") brings claims against her former

employer Halstead Property Development Marketing LLC ("Halstead PDM" or "Defendant") for

discrimination based on disability and for retaliation under the Americans with Disabilities Act,

the New York State Human Rights Law, and the New York City Human Rights Law.  Dkt. No.

1.  Defendant moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment

dismissing the claims of Plaintiff.  Dkt. No. 38.

      For the following reasons, the Court grants Defendant's motion for summary judgment

with respect to Plaintiff's ADA claims and declines to exercise supplemental jurisdiction over

Plaintiff's claims under state and local law.

## BACKGROUND

      The following facts are undisputed for purposes of this motion except where otherwise

indicated.

      Bordeaux was employed at-will at Halstead PDM as a sales coordinator and

administrative assistant for approximately six months, from on or about December 10, 2018

through May 30, 2019.  Dkt. No. 38-2 ¶ 10.  Before then, she worked for Halstead PDM through a "temp agency."  *Id.* ¶ 9.  Halstead PDM provides sales and marketing services in connection with property development and is engaged by condominium sponsors to provide sales and marketing services on-site at buildings being developed.  *Id.* ¶¶ 6–7.

During her employment, Bordeaux was assigned to work on-site at a newly developed condominium building called "The Rennie."  *Id.* ¶ 11.  Bordeaux's duties included greeting visitors (buyers, prospective buyers, vendors, delivery persons, and others) in a friendly and professional manner; organizing storage closets and other facilities; tracking and following up on supply orders; monitoring voice mail; and managing requested projects, brokers lists, and other tasks.  *Id.* ¶ 13.  Bordeaux reported to and took instruction from the entire sales team on-site at The Rennie.  *Id.* ¶ 14.  Bordeaux was sometimes required to be at The Rennie by herself as the only Halstead PDM representative.  *Id.* ¶ 15.

Several months into her employment, on April 16, 2019, Bordeaux emailed one of her supervisors at the time, Andrea M. Beckley, requesting a performance review and stating that she "was also wondering if [they] could talk about an internal transfer to a different team."  *Id.* ¶ 44; *see also* Dkt. No. 39-11.  Bordeaux stated:

> I do think I'd be a bigger advantage to a team that needs a more experienced admin or needs help setting up their new offices/systems.  This company has been really good to me and I'd just like to be able to put my skills and organization to better use.  Please let me know if this is an option at all, I wouldn't mind waiting a few months for a transfer.

Dkt. No. 39-11.  Bordeaux's request for a review and a transfer was referred to Vice President of Sales Vanessa Connelly ("Connelly") who was then Bordeaux's supervisor.  Dkt. No. 38-2 ¶ 45.

The parties dispute what prompted Bordeaux's request for a transfer.  It is undisputed that, while Bordeaux understood when she took the job that there would be times when she might be alone and that she was not allowed to leave the place unattended, she did not expect to

spend as much time as she did alone. *Id.* ¶ 46. The fact that she was required to be alone made her unhappy and, because of that, she preferred to have a different job at Halstead PDM. *Id.* Though Plaintiff does not dispute this, Plaintiff further states that she requested the transfer "because [she] was really depressed at [her] current position and [she] wanted to see if there was someplace they could transfer [her] to help it." Dkt. No. 44-1 at 76; *see also* Dkt. No. 46 ¶¶ 43–44.

Two weeks after Bordeaux's email, on April 30, 2019, Connelly met with Bordeaux for the requested performance review. Dkt. No. 38-2 ¶ 50. During the review, Connelly learned that Bordeaux was unhappy because she did not like being in the office and having to be in the office while members of the sales team had more flexibility to move in and out of the office. *Id.* Bordeaux also raised the issue of a more consistent lunch break. *Id.* ¶ 52. Connelly's takeaway from the meeting was that "a lot of the issues that [Bordeaux] was having with the job were related to the actual work for the job." *Id.* ¶ 55 (quoting Dkt. No. 39-5 at 46). For example, according to Connelly, Bordeaux "seemed upset about having to organize closets," "felt like the job was not offering enough for her," and did not "want[] to . . . track Staples packages." *Id.* (quoting Dkt. No. 39-5 at 46–47). At her deposition, Connelly testified that she did not remember Bordeaux discussing during the meeting that she suffered from depression. Dkt. No. 39-5 at 31; *see also* Dkt. No. 38-2 ¶ 51. Plaintiff disputes this account of the meeting but does so only to the extent that it fails to acknowledge that Plaintiff "advised Connelly that she was requested [sic] a transfer because she was depressed." Dkt. No. 46 ¶¶ 50–52, 55–56 (citing Dkt. No. 44-1 at 76, 77–78). More specifically, according to the relevant cited portion of Plaintiff's deposition, Bordeaux testified: "I had told [Connelly] that I was depressed at The Rennie and if there was some place they she [sic] could transfer me to." Dkt. No. 44-1 at 77. It is undisputed

that, as for the transfer request, Connelly told Bordeaux that Halstead PDM "did not have

another position for her to be transferred to."  Dkt. No. 38-2 ¶ 53.

The day after the performance review, on or about May 1, 2019, Connelly sent the

following email to Bordeaux and others on The Rennie team and copied Human Resources

Director Judith Caplan ("Caplan"):

> Hi Team:
>
> Amy and I met yesterday afternoon.  Pursuant to my conversations with all, several
> issues were identified which need to be addressed and we need to enact some
> changes.  Based on the feedback I received from each of you, here are the concerns.
>
> Amy has asked that she has and keeps one hour of lunch break per day.  I explained
> due to the nature of the industry things can push 15-20 minutes here or there based
> on how long the appointments run but the team will do their best to honor the time
> requested and will always make sure she gets one hour a day.
>
> Amy, the concerns we spoke about regarding your performance are below.
>
> Presentation to BRP employees-we discussed the two instances that were brought
> up by the sponsor and they are:
>
> 1. There was an issue of a delivery man being spoken to rudely which the sponsor
> commented on.  It is imperative that all visitors/buyers or otherwise are greeted
> kindly and treated respectfully by you.
>
> 2. There was also an instance of your checking your stocks and discussing checking
> your stocks.  Please limit personal tasks like checking in on your personal email
> and websites to your break periods or lunch hour.  It is important the sponsor knows
> you are focused and working on project related business during business hours.
>
> - TV watching-in the same category as above.  I appreciate there have been
>   moments where the team watched something together, however this should not
>   be done.  This applies to all team members.
>
> - Office Maintenance- Organization of storage closets- this should be done on a
>   bi-weekly basis to avoid future issues.  Please confirm that you understand all
>   of the required steps involved for this.
>
> - Follow up on supply orders-I appreciate that Staples can be frustrating with new
>   addresses, but all orders will need to be tracked and followed up on until
>   delivery.

- Voicemail- Please send an email as a first task in the morning and last email at night with messages broken down.  If no messages were received, please still send with that noted.

- Managing requested projects.  We discussed the example of Jeff [Krantz's] request for a broker list that took over one week to complete.  I appreciate you were reaching out with questions to parties behind the scenes, however there needs to be open communication with Jeff and Kristin [Krantz] on what is happening.  They need to know you will actively manage the requested tasks and keep them in the loop of the progress.  If you are experiencing difficulties or roadblocks, please inform them.  Once they are aware, they can get you the proper resources to help you, that you will then have in place for future requests.

These are some fundamental things that will help the office run properly.  I would like to circle back and meet with you and Kristin in a few weeks to make sure that things have improved and these are no longer an issue.

Please let me now [sic] if anything above is unclear or if you have any questions or concerns.  Thank you al [sic] in advance for your attention to the items above.

*Id.* ¶ 57; *see also* Dkt. No. 39-12.

It is undisputed that Bordeaux had an unpleasant interaction with a delivery man who had looked at the sales list and asked about one of the condominium units.  Dkt. No. 38-2 ¶ 60.  In the presence of others, Bordeaux said, "Yeah, sure, if you can afford it," which made him feel insulted and to which he took offense and considered rude.  *Id.*  The incident was reported to Halstead PDM and to Connelly, and Bordeaux was called by one of the sales agents to whom she reported and admonished "that's not who we are."  *Id.*  It is undisputed that, when asked at her deposition if there was ever a time when she was checking stocks, personal email, and websites while she was on the job, Bordeaux responded, "Yes."  *Id.* ¶ 62.  It is also undisputed that Bordeaux made personal phone calls using her cell phone while on the job at Halstead PDM.  *Id.* ¶ 63.

The parties dispute whether Bordeaux made disclosures about her mental health during her employment at Halstead PDM.  Defendant states that Bordeaux did not share that she suffered from depression.  *Id.* ¶ 79.  For example, Connelly testified at her deposition that she did

not recall learning at any point during Bordeaux's tenure that she suffered from depression.  Dkt. No. 39-5 at 31.  Similarly, Kristen Kranz ("Krantz"), a sales manager at The Rennie, testified at her deposition that she did not recall Bordeaux ever telling her that she suffered from depression. Dkt. No. 39-6 at 25; *see also id.* at 32, 35.  Others who worked at Halstead PDM testified to the same effect.  Dkt. No. 38-2 ¶ 79.

Plaintiff, however, disputes this and states that she disclosed this information to both Connelly and Krantz.  Dkt. No. 46 ¶ 79 (citing Dkt. No. 44-1 at 69, 77–78, 122–24, 128–31). Aside from the testimony already discussed, the cited portions of Plaintiff's deposition contained the following additional testimony:

Q: Was there any other occasion in an employment context when you disclosed or communicated about any mental condition you had?

A: Yes.

Q: When next?

A: When I had to start seeing a psychiatrist for Halstead.  I spoke to Kristin [Krantz] about it.

Dkt. No. 44-1 at 69.  Plaintiff also testified that "Kristin [Kranz] knew that I was having this psychiatrist appointment."  *Id.* at 122.

Q: So you beforehand you told Kristin Krantz that you had a psychiatrist appointment at some point?

A: Yes.

. . .

Q: When you made the request of Kristin or informed her that you had this appointment, what specifically did you say to her?

A: I remember telling her that I needed to see a psychiatrist.

Q: Did you say anything else?

A: I don't think so.

Q: What, if anything, did Kristin say in response to that statement?

A: I can't remember her response.

Q: Do you recall anything else about that conversation?

A: No, not right now.

*Id.* at 122–24.  Plaintiff also testified about a conversation she had with Krantz after this

appointment:

Q: Did you have a conversation with Kristin Krantz or anyone else at Halstead regarding that appointment at [sic] any medical information regarding that appointment?

A: Yes, after my appointment I saw Kristin in the elevator.

Q: When did that take place in relation to the time you had your appointment on April the 9th of 2019?

A: Directly after my appointment I was going up to the sales office, Kristin happened to be in the elevator at the same time.

. . .

Q: What did you say to Kristin while you were in the elevator?

A: I told her that they have to switch my medication because I was having anxiety attacks along with my depression.

. . .

Q: Did you say anything else?

A: No.

Q: What, if anything, did Kristin Krantz say to you in that elevator conversation?

A: She said something along the lines of depressions are hard or that sucks.

Q: Which was it?  She said "that sucks"?

A: I'm pretty sure she said something along the lines of depressions are hard when we got into the office.

*Id.* at 129–31.  Though the deposition transcript refers to a psychiatrist appointment, it is

undisputed that Bordeaux has never visited a psychiatrist (a medical doctor who practices in the

7

field of psychiatry).  Dkt. No. 38-2 ¶ 114.  The record reflects that the appointment that Plaintiff

discusses at her deposition was an appointment on April 9, 2019 via video at a facility called

Soho Medical Doctors, PLLC.  *Id.* ¶ 122.  The record also reflects that Bordeaux received a

clinical assessment or diagnosis of "[a]djustment disorder with mixed anxiety and depressed

mood" with the medical ICD-10-CM Code F43.23, which is "the diagnosis code used for

Adjustment Disorder (AD) with Mixed Anxiety and Depressed Mood."  *Id.* ¶ 119.  The

assessment was made by a nurse practitioner and not by a medical doctor or psychiatrist.  *Id.*

Plaintiff also points to an incident in which Krantz, Connelly, and Caplan expressed

concerns about Plaintiff after someone alerted Krantz to one of Plaintiff's Instagram posts.  Dkt.

No. 46 ¶ 79.  An individual named "Sara" texted Krantz, stating that she had seen Plaintiff's

"post crying and saying she wasn't sure how much longer she'd be able to make it like this."

Dkt. No. 44-9.  The record reflects that, on May 24, 2019, Krantz emailed a screenshot of the

text message to Connelly along with the email text "Got this from an acquaintance just now."  *Id.*

Connelly testified that she and Krantz then brought it to Caplan's attention.  Dkt. No. 44-3 at

141.  Connelly testified that "[i]t was troubling," "[i]t raised a red flag for me and I sent it to

HR," and "it was alarming."  *Id.*  Caplan sent Connelly the brochure for the company's employee

assistance plan to share with Bordeaux.  Dkt. No. 44-4 at 51.

It is undisputed that during the time Bordeaux was employed by Halstead PDM, she was

able to care for herself and did not need any assistance to do so, was able to perform manual

tasks and did not need any assistance to do so, and was able to see, hear, eat, sleep, walk, stand,

reach for things, lift, bend, speak, breathe, learn, read, concentrate, think, communicate, and

work.  Dkt. No. 38-2 ¶¶ 87–105.

On May 30, 2019, Bordeaux's employment with Halstead PDM was terminated.  *Id.* ¶ 66.

Bordeaux was informed of her termination at a meeting with Caplan and Connelly.  *Id.* ¶ 69.

According to Bordeaux, Caplan "told [her] that the sales team was unhappy and [Bordeaux] was

unhappy and unfortunately today was [her] last day."  *Id.*  At the meeting, Bordeaux did not say

anything "regarding any physical or mental condition or disability that [she] thought [she] might

have that would have some kind of impact on what happened to [her] in the course of [her]

employment at Halstead."  *Id.* ¶ 76.

> Connelly testified that the reasons for Bordeaux's termination were as follows:
>
> Between review period, and when she was terminated, instead of sort of course correcting and making things better within the office, communication became very difficult.  And things became not good.  I mean, I was told that there was not—she was not speaking to Kristin [Krantz] for a good bit of it.  The president of the company was made aware and there was a consensus reached that the current situation was not tenable.

*Id.* ¶ 67 (quoting Dkt. No. 39-5 at 58).  Connelly further testified:

> I believed that she should be terminated because when we met she very much did not seem to want to take on the responsibilities of her job.  I think I laid out an effective road map to course correct, you know, and get things going.  And one of the components of that was to open communication with the sales team and, you know, kind of get things back on track, and instead of moving in a positive direction, it moved into a more extreme negative direction.

*Id.* ¶ 68 (quoting Dkt. No. 39-5 at 67).  In addition, Caplan testified about the reasons for which

Bordeaux was terminated:  "The developer was not happy with her performance.  The on-site

sales team was not happy with her performance.  I believe she was not happy with being there."

*Id.* (quoting Dkt. No. 39-8 at 22).  Caplan testified, "I use the term not happy, but I don't mean

happy or sad. . . . I mean dissatisfied with her role or unsuited for the role."  Dkt. No. 39-8 at 23.

Plaintiff disputes these reasons for her termination to the extent that the reasons conflict

with a May 31, 2019 email sent by Caplan describing the reason for the termination as "mutual

agreement, she was unhappy and the sales team was unhappy."  Dkt. No. 46 ¶ 67 (quoting Dkt.

No. 44-10); *see also id*. ¶ 68.  Further, in response to a question at her deposition about whether she was unhappy with her job at The Rennie, Plaintiff responded, "I'm depressed not unhappy with my job."  Dkt. No. 44-1 at 190; *see also* Dkt. No. 46 ¶ 70.  Plaintiff also states that she continued to interact with Krantz in the same manner as she had throughout her employment. Dkt. No. 46 ¶¶ 67–68.  In her deposition, Plaintiff denied giving Krantz the "silent treatment," agreed that her responsiveness toward Krantz remained unchanged, and described her interactions with Krantz as "pleasant, neutral."  Dkt. No. 44-1 at 88–89.

Though Bordeaux had been terminated, Caplan invited Bordeaux to send her resume to Caplan because Caplan had some positions available at affiliate companies.  Dkt. No. 38-2 ¶¶ 73–74.  Bordeaux did not send her resume or follow up on this invitation.  *Id.* ¶ 75.  Bordeaux started working again at a temporary job within a month or so after the termination and then subsequently at a more permanent job.  *Id.* ¶ 78.

## PROCEDURAL HISTORY

Plaintiff filed her complaint against Defendant on February 14, 2020.  Dkt. No. 1.  The complaint alleges six causes of action: (1) discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; (2) retaliation under the ADA, 42 U.S.C. § 12203; (3) discrimination under New York State Human Rights Law, N.Y. Exec. Law § 296; (4) retaliation under the New York State Human Rights Law, N.Y. Exec. Law § 296(7); (5) discrimination under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1); and (6) retaliation under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7).  Dkt. No. 1. ¶¶ 40–70.

On May 3, 2021, Defendant filed its motion for summary judgment.  Dkt. No. 38. Plaintiff filed her memorandum of law in opposition to the motion for summary judgment on

June 1, 2021.  Dkt. No. 45.  Defendant filed its reply memorandum of law in support of the

motion for summary judgment on June 16, 2021.  Dkt. No. 52.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the

non-moving party "rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v.

Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105,

114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R.

Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz*, 258 F.3d at 69) (citation omitted).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented.  Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving

party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn,

requires the party opposing the motion to "include a correspondingly numbered paragraph

responding to each numbered paragraph in the statement of the moving party, and if necessary,

additional paragraphs containing a separate, short and concise statement of additional material

facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All

statements in a Local Rule 56.1 submission "must be followed by citation to evidence which

would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material

facts set forth in the statement required to be served by the moving party will be deemed to be

admitted for purposes of the motion unless specifically controverted by a correspondingly

numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

## DISCUSSION

Defendant moves for summary judgment on all of Plaintiff's claims.

## I.   Plaintiff's Claims Under the Americans with Disabilities Act

### A.   Discriminatory Discharge

Defendant is entitled to summary judgment on Plaintiff's claim for discriminatory

discharge under the ADA.

"The ADA prohibits discrimination against 'any qualified individual with a disability

because of the disability of such individual in regard to,' inter alia, discharge from employment."

*Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting 42 U.S.C. § 12112(a)).

"ADA employment discrimination claims are subject to the familiar burden-shifting analysis

established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

A plaintiff must establish a prima facie case; the employer must offer through the introduction of

admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff

must then produce evidence and carry the burden of persuasion that the proffered reason is a

pretext." *Sista*, 445 F.3d at 169. "To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

### 1.      Prima Facie Case—Disability

Regarding the prima facie case, Defendant argues that Plaintiff cannot establish disability within the meaning of the ADA. Plaintiff responds that she has set forth enough evidence to create a genuine issue of material fact about whether Plaintiff actually had a disability or whether Defendant regarded her as having a mental impairment.

Under the ADA, disability with respect to an individual is defined to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). At issue in this case are the definitions of actual disability and "regarded as" disability under subsections (A) and (C), respectively.

### a.      Actual Disability

Plaintiff has failed to raise a genuine dispute of material fact as to whether she had an actual disability under the ADA.

"Courts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA." *Cody v. Cty. of Nassau*, 577 F. Supp. 2d 623, 637 (E.D.N.Y. 2008) (quoting *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 296 (S.D.N.Y. 2003)), *aff'd*, 345 F. App'x 717 (2d Cir. 2009). "First, a plaintiff must demonstrate that she suffers from a physical or mental impairment. Second, plaintiff must identify the activity claimed to be impaired and

establish that it constitutes a major life activity.  Third, a plaintiff must demonstrate that her impairment substantially limits the major life activity identified in step two." *Id.* at 638 (internal quotation marks and citations omitted and alteration adopted); *see also Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 163 (S.D.N.Y. 2020) ("To establish a disability, a plaintiff must: (1) 'show that she suffers from a physical or mental impairment'; (2) 'identify the activity claimed to be impaired and establish that it constitutes a major life activity'; and (3) 'show that her impairment substantially limits the major life activity previously identified.'" (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002))), *aff'd*, 2021 WL 5986999 (2d Cir. Dec. 17, 2021).  In 2008, Congress amended the ADA and "instructed courts that the definition of disability . . . shall be construed in favor of broad coverage of individuals, and that an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." *Woolf*, 949 F.3d at 94 (internal quotation marks and citations omitted).  The "principal purpose" of these amendments was to "make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Id.*

 "Under the ADA, 'major life activities' include, but are not limited to, 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working,' 42 U.S.C. § 12102(2)(A), as well as the operation of major bodily functions, including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions,' *id.* § 12102(2)(B)." *Norman*, 492 F. Supp. 3d at 163.  "To determine what constitutes a 'substantial limitation' of a major life activity, courts have looked to the [Equal Employment Opportunity Commission ("EEOC")] regulations implementing the ADA.  Although the regulations are not

binding, courts in the Second Circuit afford them significant deference." *Id.* "Though the effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of the ADA, the duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe." *Id.* (internal quotation marks and citations omitted and alteration adopted).

Defendant first argues that Plaintiff has not provided evidence that she suffers from any impairment and instead has only self-diagnosed herself as having anxiety and depression. Dkt. No. 41 at 14–16. But Defendant's own argument is undermined by the evidence it points to in its statement of material facts accompanying its motion for summary judgment. It is undisputed that, during the time Bordeaux worked for Halstead PDM, Bordeaux received a clinical assessment or diagnosis of "[a]djustment disorder with mixed anxiety and depressed mood" with the medical ICD-10-CM Code F43.23, which is "the diagnosis code used for Adjustment Disorder (AD) with Mixed Anxiety and Depressed Mood."[1] Dkt. No. 38-2 ¶ 119. And the

---

[1] Defendant argues that Plaintiff does not present any competent medical evidence to establish an impairment. *See* Dkt. No. 41 at 18; Dkt. No. 52 at 3 & n.3. In opposition to the motion for summary judgment, Plaintiff's counsel attaches to his declaration Plaintiff's medical records from Family Medicine Associates of West Babylon and Plaintiff's medical records from SohoMD. *See* Dkt. Nos. 44-5, 44-6. Defendant claims that these records are inadmissible because they do not have a foundation and that they are subject to preclusion because there has been no expert disclosure under Federal Rule of Civil Procedure 26(a)(2)(B) or (C). Dkt. No. 52 at 3 n.3. Defendant is correct that "[a]s a threshold matter, these documents are not admissible . . . because they are not self-authenticating, and the affirmation of plaintiff's attorney is insufficient to establish their admissibility as hearsay under Federal Rule of Evidence 803." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 136 n.10 (E.D.N.Y. 2015) (citing *Singh v. Bay Crane Servs., Inc.*, 2013 WL 5655931, at *2 n.4 (E.D.N.Y. Oct. 11, 2013)); *see also Duchnowskl v. Cty. of Nassau*, 416 F. Supp. 3d 179, 182 (E.D.N.Y. 2018). Defendant, however, relies upon these same medical records in its statement of material facts in support of its motion for summary judgment when it references Plaintiff's "medical records (as produced in discovery)" and cites to Plaintiff's responses to Defendant's request for admissions, which quotes from those same medical records. *See, e.g.*, Dkt. No. 38-2 ¶¶ 119-127, 129; Dkt. No. 39-9. Even if the

definition of physical or mental impairment includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness."  29 C.F.R. § 1630.2(h)(2).  A reasonable jury could conclude that Plaintiff suffers from a mental impairment.

Even though Plaintiff has offered evidence that would support that she suffers from a mental impairment, however, Plaintiff falls short at the second and third parts of the test for actual disability:  Plaintiff has failed to provide evidence of a major life activity that has been impaired and has failed to establish that the impairment represents a substantial limitation on that major life activity.  *See Robles v. Medisys Health Network, Inc.*, 2020 WL 3403191, at *6 (E.D.N.Y. June 19, 2020) ("A medical diagnosis, without more, 'establishes only that a plaintiff suffered an impairment,' and 'not that his ability . . . was substantially limited by that impairment.'" (alterations adopted) (quoting *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 136 n.10 (E.D.N.Y. 2015))).

The only major life activity Plaintiff attempts to argue has been impaired is brain function.  Dkt. No. 45 at 7–8; *see also* 42 U.S.C § 12102(2)(B) (identifying brain function as a major life activity).  Plaintiff cites to a regulation implementing the ADA, 29 C.F.R. § 1630.2(j)(3)(iii), to argue that Plaintiff has a condition that substantially limits brain function and is therefore a disability under the ADA.  That regulation provides that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the

---

Court considers the medical records submitted by Plaintiff's counsel, however, the records are not sufficient to raise a genuine issue of material fact as to whether Plaintiff had an actual disability.  The records from Family Medicine Associates of West Babylon appear to cover the period from January 2014 to January 2018, the time period before Plaintiff's employment at Halstead PDM.  The medical records add evidence that Plaintiff was assessed as having anxiety, was prescribed medication, and was given a referral for psychotherapy.  Dkt. No. 44-5.  The records also reflect that, at a visit on December 22, 2015, Plaintiff was assessed as having both anxiety (F41.9) and chronic depression (F34.1).  *Id.*  This evidence does not affect any material facts in the analysis of whether Plaintiff had an actual disability under the ADA.

major life activities indicated: . . . major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function." *Id.* It is true that, in these regulations, "the EEOC does accord some weight to certain medical diagnoses." *Robles*, 2020 WL 3403191, at *6. But Plaintiff has not provided any evidence that any diagnoses she has received equate to or fall under the criteria for "major depressive disorder" or any of the other disorders listed in the regulation. *Cf. Zuckerman v. GW Acquisition LLC*, 2021 WL 4267815, at *11 (S.D.N.Y. Sept. 20, 2021) (holding, on a motion to dismiss, that "Plaintiff's alleged mental health condition, generalized anxiety disorder, is not on the list of EEOC conditions likely to qualify as a disability by its very nature" and therefore "allegations that Plaintiff has been diagnosed with the condition, without more, are insufficient to plead that Plaintiff suffered from an ADA-qualifying disability"). Major depressive disorder like the disorders listed alongside it in 29 C.F.R. § 1630.2(j)(3)(iii)—bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia—is a diagnosable mental impairment. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense cannon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated."). Accordingly, that an individual is "depressed" or was assessed as having a depressed mood, without more, does not necessarily lead to the conclusion that the individual suffers from major depressive disorder. *See generally Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 472 (8th Cir. 2007) ("Depression, like many mental illnesses, is a condition with many variations, and in common parlance the word is used to describe a wide variety of symptoms, including simply 'a state of feeling sad.'" (citing Merriam-Webster Dictionary (2007))). Here, the record reflects that Plaintiff was diagnosed

with an adjustment disorder with mixed anxiety and depressed mood.[2]  But Plaintiff has offered

no evidence to show that this adjustment disorder falls under the umbrella of major depressive

disorder.  Thus, Plaintiff cannot rely on 29 C.F.R. § 1630.2(j)(3)(iii) alone to demonstrate that

Plaintiff's brain function was substantially limited.  And without additional evidence that her

impairment has substantially limited a major life activity, Plaintiff cannot show that she had an

actual disability.

The cases relied on by Plaintiff are also distinguishable from the case at hand.[3]  Plaintiff,

for example, cites *Bracken v. DASCO Home Med. Equip., Inc.*, 2014 WL 4388261 (S.D. Ohio

Sept. 5, 2014).  In *Bracken*, the court concluded that the plaintiff presented enough evidence to

satisfy the impairment requirement where the plaintiff was diagnosed with a mood disorder, was

prescribed an anti-depressant for his condition, and was noted to be moody with anhedonia (the

absence of pleasure from the performance of acts that would ordinarily be pleasurable).  *Id.* at *6

n.10, *9.  As to whether such impairment substantially limits a major life activity, the plaintiff in

*Bracken* "testified that he had trouble sleeping and eating over a period of more than six months,

that sometimes he would hardly sleep for three or four nights and then would sleep too much at

other times, that he lost a significant amount of weight, and that he had serious mood swings and

was highly irritable with others."  *Id.* at *10.  The court concluded that such evidence was

---

[2] As discussed *supra* note 1, the parties disagree whether Plaintiff's medical records are admissible.  Even if the Court considers the records, they only provide evidence that, at points prior to her employment at Halstead PDM, Plaintiff was assessed as having anxiety (F41.9) and chronic depression (F34.1).  Yet Plaintiff provides no evidence equating these assessments to major depressive disorder and thus cannot solely rely on 29 C.F.R. § 1630.2(j)(3)(iii) to establish disability under the ADA.

[3] Plaintiff also cites to *Hettiarachchi v. Cty. of Suffolk*, 2020 WL 5848617 (E.D.N.Y. Sept. 30, 2020), which concerns the distinct condition of bipolar disorder, and *Gaube v. Day Kimball Hospital*, 2015 WL 1347000 (D. Conn. Mar. 24, 2015), which was decided on a motion to dismiss rather than a motion for summary judgment.

sufficient to raise a fact issue as to whether the plaintiff had an impairment that substantially

limited major life activities.[4]  *Id.*  After so concluding, the *Bracken* court added a footnote

discussing 29 C.F.R. § 1630.2(j)(3)(iii) and the guidance that major depressive disorder

substantially limits brain function.  *Id.* at *10 n.19.  The footnote first noted that the plaintiff "did

not have a specific diagnosis of major depressive disorder."  *Id.*  But it pointed out that the

plaintiff was diagnosed with a mood disorder, "a category under which major depressive disorder

may fall on the Diagnostic and Statistical Manual of Mental Disorders (DSM IV TR)

classification systems" and that the plaintiff "was prescribed an anti-depressant medication and

displayed anhedonia, a common symptom of major depressive disorder."  *Id.*  Putting aside that

the *Bracken* court did not conclude that such evidence was sufficient to suggest that such an

impairment substantially limits brain function,[5] this footnote does not bolster Bordeaux's

argument in the case at hand.  Notably, the footnote attempts to associate the *Bracken* plaintiff's

condition with major depressive disorder.  Here, however, Bordeaux makes no attempt to show

how her impairment relates to major depressive disorder; the lack of evidence to this point is

fatal to Bordeaux's argument.

Plaintiff therefore has not introduced evidence sufficient to raise a genuine issue of

material fact as to whether her impairment substantially limited a major life activity and whether

she had an actual disability under the ADA.

---

[4] By contrast, here, Plaintiff has not presented any such evidence that her impairment has caused
similar limitations to major life activities.  Rather, the record shows that it is undisputed that
Plaintiff was able to care for herself and did not need any assistance to do so, was able to
perform manual tasks and did not need any assistance to do so, and was able to see, hear, eat,
sleep, walk, stand, reach for things, lift, bend, speak, breathe, learn, read, concentrate, think,
communicate, and work.
[5] The Court does not express an opinion on whether the *Bracken* court's logic would be
sufficient.

b.      **Regarded as Disabled**

Plaintiff also argues that she is considered disabled under the ADA because Defendant

regarded her as having a mental impairment.  Dkt. No. 45 at 8–9.  Defendant responds that there

is no case for "regarded as" disability.  Dkt. No. 52 at 6–9.

Disability under the ADA is defined to include being regarded as having a physical or

mental impairment.  *See* 42 U.S.C. § 12102(1)(C).  "An individual meets the requirement of

'being regarded as having such an impairment' if the individual establishes that he or she has

been subjected to an action prohibited under this chapter because of an actual or perceived

physical or mental impairment *whether or not* the impairment limits or is perceived to limit a

major life activity."  *Id.* § 12102(3)(A) (emphasis added).  This definition of disability "shall not

apply to impairments that are transitory and minor," and "[a] transitory impairment is an

impairment with an actual or expected duration of 6 months or less."  *Id.* § 12102(3)(B).

Notably, this standard differs from the one in place prior to the 2008 amendments to the ADA;

under the prior standard, "a plaintiff . . . seeking to avail himself of the 'regarded as' prong of the

definition of 'disability' needed to show that he was perceived as both 'impaired' and

'substantially limited in one or more major life activity.'"[6]  *Hilton v. Wright*, 673 F.3d 120, 128

(2d Cir. 2012).

"To survive summary judgment, a plaintiff is required to raise a genuine issue of material

fact as to whether the employer 'regarded him as having a mental or physical impairment.'"

*Sacks v. Gandhi Eng'g, Inc.*, 999 F. Supp. 2d 629, 633 (S.D.N.Y. 2014) (quoting *Hilton*, 673

F.3d at 128).  "When a plaintiff brings a claim on the basis . . . that his employer regarded him as

disabled, 'the decisive issue is the employer's perception of his or her employee's alleged

---

[6] To the extent Defendant relies on cases applying the prior definition of "regarded as" disability, the Court does not find Defendant's argument persuasive.

impairment.'" *Id.* (quoting *Giordano v. City of New York*, 274 F.3d 740, 748 (2d Cir. 2001)). "To determine whether a plaintiff's employer regarded her a disabled, we look primarily to the views of the person who made the decision to take adverse employment actions, rather than those of other supervisors or employees." *Bruzzese v. Sessions*, 725 F. App'x 68, 71 (2d Cir. 2018) (summary order).

Plaintiff argues that "Defendant certainly perceived that Plaintiff suffered from a depression." Dkt. No. 45 at 8. Plaintiff points to disclosures that she made to Krantz about her mental health and to which Krantz responded to the effect of "depressions are hard." *Id.* at 8–9. And Plaintiff highlights the response by Krantz, Connelly, and Caplan to being notified about one of Plaintiff's Instagram posts as evidence that they believed Plaintiff was suffering from a mental impairment. *Id.* at 9.

Plaintiff, however, cannot defeat summary judgment because the evidence does not provide any basis for a reasonable jury to conclude that Defendant perceived Plaintiff as having a mental impairment other than one that was at most transitory or minor. Plaintiff, for example, testified that she had told Connelly that she "was depressed at The Rennie" and asked for a transfer. But the statement that Plaintiff was depressed at her specific job site does not suggest that Plaintiff suffered from a mental impairment lasting longer than six months. Plaintiff also testified that she told Krantz about having a psychiatrist appointment—which the parties agree was an appointment with a nurse practitioner and not a psychiatrist—and, after the appointment, had a conversation with Krantz about it in the elevator. Plaintiff testified that she told Krantz "that they have to switch my medication because [she] was having anxiety attacks along with [her] depression," and Krantz "said something along the lines of depressions are hard." Dkt. No. 44-1 at 129–31. Krantz's response here does not suggest that she perceived Plaintiff to have a

mental impairment; rather, the plural use of the term depressions suggests that Krantz was using the term in the colloquial sense—as a state of feeling sad—rather than in a clinical sense. Moreover, even if Krantz's response could be understood to mean that she perceived Plaintiff to have a mental impairment that was not transitory or minor, courts "look primarily to the views of the person who made the decision to take adverse employment actions, rather than those of other supervisors or employees." *Bruzzese*, 725 F. App'x at 71. And Plaintiff does not cite to evidence showing that Krantz made the decision to terminate her.

Plaintiff lastly focuses on the communications between Krantz, Connelly, and Caplan in response to Plaintiff's Instagram post. Though the record demonstrates that these individuals each expressed some level of concern about Bordeaux's "mental and emotional stability," this evidence "is not more than a mere 'scintilla' of evidence that [they] regarded [Bordeaux] as disabled." *Bruzzese*, 725 F. App'x at 72. The case *Bruzzese v. Sessions* is illustrative. In *Bruzzese*, the plaintiff filed suit after he was reassigned to a different role by his supervisor, arguing that he was reassigned because his supervisor regarded him as suffering from a mental impairment.[7] *Id.* at 69–70. The supervisor had learned that others were concerned about the plaintiff's mental and emotional stability and that the plaintiff had made homicidal and suicidal comments. *Id.* at 69. At his deposition, the supervisor acknowledged that he was worried about the plaintiff's mental and emotional stability based on what others had told him. *Id.* The Second Circuit in a summary order affirmed the district court's decision to grant summary judgment to the defendant because the plaintiff did not raise a genuine dispute of material fact as to whether the supervisor regarded the plaintiff as disabled. *Id.* at 71. So too here; a reasonable jury would

---

[7] The plaintiff in *Bruzzese* sued under the Rehabilitation Act, but the relevant standards set forth in the ADA applied. *Id.* at 70–71.

not understand the evidence in the record to suggest that Krantz, Connelly, and Caplan's actions and any expressions of worry demonstrate that they perceived Bordeaux as having a mental impairment of lasting duration or a mental impairment that was not minor.  Rather, the record would seem to show that they were concerned for Bordeaux's well-being in that moment and acted accordingly.

* * *

Plaintiff therefore cannot establish disability under the ADA as part of her prima facie case, and summary judgment is appropriate for Defendant on Plaintiff's ADA claim for discriminatory discharge.

### 2.    Legitimate Non-Discriminatory Reason for Discharge

Even if Plaintiff were able to meet her burden to make out a prima facie case of disability discrimination, the Court concludes that Defendant has proffered a legitimate, non-discriminatory reason for terminating Plaintiff.  Plaintiff does not dispute that the sales team was unhappy with her performance.  *See, e.g.*, *Payne v. Cornell University*, 2022 WL 453441, at *3 (2d Cir. Feb. 15, 2022) (summary order) (holding that concerns over an individual's "ability to perform well in her position due to her skill set and communication style" was a legitimate, nondiscriminatory reason); *Davis v. Avaya, Inc.*, 295 F. App'x 380, 381 (2d Cir. 2008) (summary order) (citing *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005), for the proposition that failure to perform satisfactorily is a legitimate, nondiscriminatory reason for dismissal); *Greene v. Enlarged City Sch. Dist. of Middletown, N.Y.*, 606 F. App'x 624, 626 (2d Cir. 2015) (summary order) (holding that performance-based reasons for terminating an employee meets the burden to proffer a legitimate, non-discriminatory reason).  Plaintiff disputes whether communication with Krantz deteriorated, but a factual dispute over this aspect of Defendant's

proffered reasons for termination does not eclipse the lack of dispute over Plaintiff's overall failure to perform.

### 3.    Pretext

Plaintiff argues that Defendant's proffered reasons for her termination are pretextual. Plaintiff disputes whether communication deteriorated with Krantz and whether the termination was by mutual agreement as stated in Caplan's email regarding Plaintiff's termination.  Dkt. No. 45 at 9–10.  Plaintiff also contends that her termination six days after the incident regarding her Instagram post supports her position.  *Id.* at 10.  Plaintiff further points to the fact that Caplan's email regarding her termination indicated that Plaintiff "was unhappy" and therefore directly referred to Plaintiff's mental state and depression and reveals an issue of material fact as to pretext.  *Id.*

"Once a [d]efendant has articulated a legitimate non-discriminatory reason for the challenged employment decision, a plaintiff must 'come forward with evidence that the defendant's proffered, nondiscriminatory reason is a mere pretext for actual discrimination' or else the court will grant summary judgment for the defendant."  *Genova v. Cty. of Nassau*, 851 F. App'x 241, 242 (2d Cir. 2021) (summary order) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  "For a plaintiff to defeat a summary judgment motion, it is not enough to 'produce simply some evidence' that the employer's proffered reason is pretextual; a plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reason[] proffered by the employer [was] false, and that more likely than not discrimination was the real reason for the discharge.'"  *Id.* at 242–43 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).

Plaintiff fails to come forward with evidence sufficient to defeat a motion for summary judgment on pretext.  First, the temporal proximity between an incident that Plaintiff

characterizes as relating to her disability and her termination does not establish pretext. *See Iverson v. Verizon Commc'ns*, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely claiming temporal proximity between the disclosure of disability and termination, however, is not enough to show that [the defendant's] reasons for termination were a pretext for discrimination."); *Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206–07 (E.D.N.Y. 2013) ("Temporal proximity may be sufficient to show a prima facie case, but it is insufficient to demonstrate pretext." (collecting cases)); *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 253 (D. Conn. 2019) ("[T]emporal proximity alone does not suffice to establish pretext." (collecting cases)).

Further, a reasonable jury could not interpret Caplan's reference to Plaintiff's unhappiness as an indication of discriminatory intent. At her deposition, after explaining the reasons for Plaintiff's termination, Caplan explained that she meant that Plaintiff was "dissatisfied with her role or unsuited for the role." Dkt. No. 39-8 at 23. Plaintiff has introduced no evidence to suggest that this comment could be interpreted by a reasonable jury to refer to a disability or mental impairment or establish that she was terminated for pretextual reasons.

Finally, Plaintiff's disagreement over Defendant's assessment of her communication with Krantz and Defendant's characterization of the termination as mutual is insufficient to defeat summary judgment. "Merely disagreeing with a supervisor's assessment of work performance . . . 'is insufficient to raise a triable issue of fact regarding pretext.'" *Iverson*, 2009 WL 3334796, at *5 (quoting *Milano v. Astruel*, 2008 WL 4410131, at *41 (S.D.N.Y. Sept. 26, 2008)). "'[T]he factual validity of the underlying imputation against the employee is not at issue'; rather, the relevant question is 'what *motivated* the employer.'" *Mancini*, 411 F. Supp. 3d at 252 (quoting *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)). And even

construing all inferences in favor of Plaintiff, the evidence does not suggest that Plaintiff was

terminated for reasons motivated by discriminatory intent.  *See Genova*, 851 F. App'x at 244

("[T]he purported facts Genova cites are immaterial.  At best, the documents submitted by

Genova reflect a difference of opinion regarding the quality of Genova's work.  But Genova

points to no facts suggesting that his termination was motivated by his disability, as required to

establish a claim under the Americans with Disabilities Act.").

For these reasons, Plaintiff's ADA claim for discriminatory discharge cannot survive

summary judgment.

### B.    Failure to Accommodate

Plaintiff also brings a failure-to-accommodate claim under the ADA.

"An employer may also violate the ADA by failing to provide a reasonable

accommodation."  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  "A plaintiff

states a *prima facie* failure to accommodate claim by demonstrating that (1) plaintiff is a person

with a disability under the meaning of the ADA; (2) an employer covered by the statute had

notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential

functions of the job at issue; and (4) the employer has refused to make such accommodations."

*Id.* at 125–26.

For the same reasons given above, Plaintiff does not raise a genuine issue of material fact

about whether she can establish disability under the meaning of the ADA.[8]  Plaintiff's ADA

failure-to-accommodate claim therefore cannot survive summary judgment.

---

[8] Even if Plaintiff were able to establish "regarded as" disability, her failure-to-accommodate
would fail.  "An individual 'regarded as' disabled, but not actually disabled, cannot bring a
failure to accommodate claim as a matter of law."  *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d
120, 132 (E.D.N.Y. 2015) (citing 42 U.S.C. § 12201(h) and *Powers v. USF Holland, Inc.*, 667
F.3d 815, 823 n.7 (7th Cir. 2011)).

Even if Plaintiff could establish disability, Plaintiff has identified no evidence to establish that she notified Defendant of that disability. "[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (internal quotation marks omitted); *see also Felix v. New York City Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001) ("The general rule, therefore, is that the initial burden of requesting an accommodation is on the employee and it is only after such a request has been made that the employer must engage in the 'interactive process' of finding a suitable accommodation."), *aff'd*, 324 F.3d 102 (2d Cir. 2003). "The notice requirement is rooted in common sense. Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability. Moreover, the notice requirement prevents an employee from keeping her disability a secret and suing later for failure to accommodate." *Felix*, 154 F. Supp. 2d at 657 (citations omitted). "Defendants cannot be held liable for failing to provide a reasonable accommodation when it was plaintiff who stymied the extent of their knowledge of her alleged disability in the first instance." *Thompson v. City of New York*, 2002 WL 31760219, at *8 (S.D.N.Y. Dec. 9, 2002).

Plaintiff argues that Defendant was aware of her disability because Plaintiff told Krantz that she suffered from depression, was seeking medical treatment for her depression, and was taking medication for her depression and because Plaintiff told Connelly that she was requesting a transfer because she was depressed. Dkt. No. 45 at 11. However, for the reasons given in *supra* Section I.A.1.b, Plaintiff does not provide sufficient evidence to raise a genuine dispute of fact such that a reasonable jury could find that those individuals had notice of a disability.

Additionally, the record shows that, when Plaintiff requested an internal transfer, Plaintiff stated that the reasons for the transfer were that she thought she would "be a bigger advantage to a team that needs a more experienced admin or needs help setting up their new offices/systems" and would "just like to be able to put [her] skills and organization to better use." Dkt. No. 39-11. Plaintiff also noted that she "wouldn't mind waiting a few months for a transfer." *Id.* In the request for a transfer, Plaintiff in no way mentioned that the request was linked to a disability.

At best, Plaintiff points to her testimony that, at her subsequent meeting with Connelly, Plaintiff told Connelly that she "was depressed at The Rennie and if there was some place they she [sic] could transfer [her] to." Dkt. No. 44-1 at 77. This single comment is insufficient to raise a genuine dispute of fact as to notice. Plaintiff's own testimony undermines that she informed Connelly about a disability and instead supports Connelly's own takeaway from the meeting: that Plaintiff was unhappy at her position at The Rennie. *See Thompson v. City of New York*, 2002 WL 31760219, at *9 (S.D.N.Y. Dec. 9, 2002) ("[W]ithout adequate knowledge of her medical condition, defendants were not in a position to even offer, let alone refuse, a reasonable accommodation to plaintiff."). Additionally, by framing her request in the context of being depressed *at a particular job site*, Plaintiff did not communicate that she was requesting the transfer because of a disability. *Cf. Woolf*, 949 F.3d at (2d Cir. 2020) ("[B]ecause [the plaintiff] does not attempt to show that his work-induced impairment substantially limited his ability to work in a class or broad range of jobs, no reasonable factfinder could conclude that [the plaintiff] has a 'disability' within the meaning of the ADA."); *Davitt v. Rockland Cty. Dep't of Mental Health*, 2013 WL 1091982, at *6 (S.D.N.Y. Mar. 15, 2013) (describing how the Second Circuit found in *Prince v. Mount Sinai Hosp.*, 458 F. App'x 49, 51–52 (2d Cir. 2012) (summary order), that a plaintiff "had failed to show disability under the ADA because, her medical symptoms

resulting from workplace stress and depression only limited her ability to perform the job which she currently held, rather than a broad class of jobs").

Plaintiff's failure-to-accommodate claim under the ADA therefore does not survive summary judgment and is dismissed.

### C.    Retaliation

Plaintiff's retaliation claim under the ADA also cannot survive summary judgment. "Like discrimination claims, retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework." *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)). "To establish a prima facie case of retaliation, [a plaintiff] must show that: '(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" *Id.* (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)). "Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate non-retaliatory reason for the challenged employment action.  If the defendant meets the burden, the plaintiff must adduce evidence 'that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Id.* (quoting *Treglia*, 313 F.3d at 721).  Further, "making a good faith request for an accommodation is a protected activity." *Norman*, 492 F. Supp. 3d at 166 (citing *Weixel*, 287 F.3d at 149); *see also Rodriguez v. Atria Sr. Living Grp., Inc.*, 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012).

For reasons previously discussed, Plaintiff's ADA retaliation claim cannot survive summary judgment.  Based on the record, Plaintiff fails to raise any genuine issues of material

fact that speak to whether she requested an accommodation for a disability.  Accordingly,

without evidence of protected activity, Plaintiff's retaliation claim fails.

## II.    Plaintiff's Claims Under the New York State Human Rights Law and the New York City Human Rights Law

Having dismissed Plaintiff's federal claims against Defendant, the Court declines to

exercise supplemental jurisdiction and dismisses Plaintiff's claims under state and local law

without prejudice.  "A district court 'may decline to exercise supplemental jurisdiction' if it 'has

dismissed all claims over which it has original jurisdiction.'"  *Kolari v. N.Y.-Presbyterian Hosp.*,

455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)).  "Once a district court's

discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy,

convenience, fairness, and comity,' in deciding whether to exercise jurisdiction."  *Id.* (quoting

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "In weighing these factors, the

district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case

in which all federal-law claims are eliminated before trial, the balance of factors . . . will point

toward declining to exercise jurisdiction over the remaining state-law claims.'"  *Id.* (quoting

*Cohill*, 484 U.S. at 350 n.7).  Pursuant to its discretion under 28 U.S.C. § 1367(c)(3), the Court

declines to exercise supplemental jurisdiction over Plaintiff's claims under the New York State

Human Rights Law and the New York City Human Rights Law, and these claims are dismissed

without prejudice.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED with respect to the federal

claims.  The Court declines to exercise supplemental jurisdiction over the claims under state and

local law and dismisses those claims without prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 38 and to close the case.

SO ORDERED.

Dated: February 16, 2022
New York, New York

_____
LEWIS J. LIMAN
United States District Judge